16-353 People v. DeAndre McMichaels Council that are going to argue please approach. Give us your name and tell us who you represent. Lauren Mouser from the State Appellate Defender on behalf of DeAndre McMichaels. Marcy Jacobs, Assistant State's Attorney on behalf of the People of the State of Illinois. Okay. We have two cases with the same office on both cases. Same offices on both cases and sort of the same issues. So we're going to hose it to your time today. Twenty minutes. Save some time for rebuttal. And speak loudly and let's be effective. Okay. Thank you. Your Honors, I would like to request five minutes for rebuttal. Sure. Again, Lauren Mouser on behalf of DeAndre McMichaels. DeAndre McMichaels' motion to suppress should have been granted in this case, but the State failed to produce evidence justifying either the warrant and seizure or warrantless arrest. After Aguilar, handgun ownership is presumptively lawful and the mere report that someone possibly is carrying a weapon without more is not enough to provide the police with a reasonable suspicion of criminal activity or probable cause for arrest. In this case, the officers were patrolling and got a radio dispatch that a black male with dreadlocks wearing a black shirt and yellow shorts had a gun. That was the extent of the dispatch. The officers knew nothing about the identity of the tipster, how they had this information that Mr. McMichaels had a gun. There was no evidence that he was brandishing the gun. No evidence that this tipster knew about his criminal background. No evidence that this tipster knew whether he could lawfully carry a gun. There was a specific location, however. Say that again. Specific location. Specific location, yes. No evidence that this was a high crime area, that there had been reports of shootings. At that time, the officers have a report of mere gun possession. That's what they're faced with. However, when they arrive at the location where they'd seen Mr. McMichaels standing about an hour before and said, you know, we remembered his shorts, but he hadn't been doing anything suspicious at that time, when they roll up in that area, three officers immediately get out of the car, announce police, and tell everyone they have to put their hands up. At that point, Mr. McMichaels had been seized by this show of force by the officers. A reasonable person in those circumstances would not have been felt free to leave. And at that time, the officers had nothing more than mere gun possession. They had zero evidence that Mr. McMichaels particularly could not lawfully own a handgun. So while the officers may stop and conduct a brief investigative detention if they have a suspicion of criminal activity, mere gun possession without more is not criminal activity after Aguilar. On appeal, the state has argued that this was just a consensual encounter at that time, and ordering McMichaels to put his hands up didn't constitute a show of force. However, the crux of a consensual encounter between citizens and the police is that that individual is free to ignore the police and go about his business. Here, the officers, as soon as the officers ordered these men to put their hands up, McMichaels put his hand in his pocket and started to turn around, and they immediately grabbed him. So to the extent that this was a consensual encounter, his exercising his right to leave that encounter could not provide the officers with any additional reasonable suspicion of criminal activity, specifically that he was carrying an unlicensed handgun. And to the extent that, you know, even if a handgun in this case were, the presence of a handgun were enough for the officers to briefly conduct an investigative search pursuant to Terry, what happened here was the second they found a gun in his pocket, he was immediately arrested. There was no inquiry at that time into whether he was, you know, into his background or to whether he was licensed to carry the gun. So the arrest immediately followed upon the finding of the handgun. So as this Court has acknowledged, under the current landscape where firearm possession is presumptively lawful, a scheme where you arrest first and then inquire into the licensing status later is no longer a valid method of policing. So here, because the police did not have reasonable suspicion of any criminal activity when he was merely alleged to be carrying a gun, both the search and subsequent arrest were unlawful. Do you guys have any questions, or I will reserve my time for the bottom. Okay. Thank you. Good morning, Your Honors. I want to start by clarifying our position. So we agree that uncorroborated anonymous tips are not enough to support reasonable suspicion for a Terry stop. And we also agree that an officer cannot even pat down a person during a consensual encounter without reasonable suspicion that that person is armed. And finally, we agree that the mere possession of a gun may not be illegal. But that's not what happened here. So here, the investigation simply began with the anonymous tip. And the anonymous tip, while it cannot support, be the sole support for reasonable suspicion to pat someone down, it also cannot be ignored. And we certainly don't want our police to ignore such an anonymous tip. We want them to do exactly what they did here, which was to go and investigate. So they were given a very specific description of a man who may have been armed at a particular location, and they remembered that they actually saw that man there within the hour before they received the tip. And so what did they do? They drove to the location, and they pulled up in their unmarked car, and they got out of the car, and they noticed that the man was still standing there matching that description in a group of three other men. And at that time, defendant certainly was not detained. And from a distance of 10 to 15 feet away, they asked everybody to show their hands. At that time, three of the four people did. Defendant did not. At that time, defendant was not detained. And instead, defendant, what he did was put his hand in his pocket and turn away. They began to approach. They got closer, and they repeated their request, which was to show their hands. And defendant, again, did not comply with the request, chose not to comply. He was not detained at that time either. So it was not until that they went over and decided to perform a protective pat-down that one of the officers touched his shoulder, and that at that time he was detained. So he wasn't detained up until that point. And at the point where they touched his shoulder to perform the protective pat-down, they did have reasonable suspicion. But I'll get to that in a second. And I just do want to address the point that counsel made about that this was a command and it was nothing else but a command. Look, none of the Mendenhall factors applied here. None of them. Certainly we all know, this court well knows, that an officer can walk up to any citizen on the street and ask them any question, even an incriminating question. And in this case, as our Illinois Supreme Court has found in People v. Amond, that the officers were actually outnumbered by the people on the street. So that first factor does not suggest that they were detained. Even though they were investigating a crime of someone possibly having a gun, they did not display their weapons. There's no evidence whatsoever that they displayed their weapons. And there was no physical touching up until that point. And for the fourth factor, that they asked the four people to show their hands, the only evidence on the record is about what happened, about any tone of voice. There was literally no evidence that their tone of voice indicated that their compliance with the request was compelled. The only evidence was the officer's testimony that he asked. And this is a question of fact for the fact finder. And the fact finder, in fact, made that finding. He said that I find that they asked. And that finding, which this Court must give deference to, especially because it's not against the manifest weight of the evidence, I do want to point out it is defendants' burden of initial production and ultimate burden of persuasion. And he did not testify in this case. He did not put on any evidence whatsoever to contradict the officer merely asked. So the finding of fact that the trial court made should be given deference by this Court. Additionally, the fact that the defendant chose not to comply is in and of itself an indication that he was not seized, as again found by the Illinois Supreme Court and Amand and other courts. And some other indications that he was not seized at that point, this was an encounter on a public street. It was an unmarked car. There was no oscillating lights. So there's literally nothing here to show that until the moment that the officer touched his shoulder that he was detained. So now we get to the fact that at the point that he did touch the shoulder, and they did decide affirmatively they were going to affect that pat down, they had a lot more information. This is very different than the case of Florida v. J.L., where literally the police got an anonymous tip, walked over, patted down the guy. There's no evidence in J.L. that the officers asked J.L. any questions and observed his response to those questions and observed any movements before they patted him down. But here it's a whole different story. Again, we're not ignoring the anonymous tip, but now we're combining it with the more additional information that the officers knew in that case, which was that in response to their request, when everyone else showed their hands, this defendant puts his hand in his pocket and he turns away. And, you know, I think that these officers are experienced, and of course we need to consider their experience, and we need to consider it all in the light of it's a quick appraisal of what's going on there, that it was very reasonable for them to fear for their safety and the safety of others around them, that this individual, they are armed with a tip, thinking he could be armed, may have been armed. So it was proper to pat him down at that time. And I do want to point out, too, that the case of People v. Richardson, a First District case, the further movements that the defendant made in that case, the response to the defendant's, to the police officer's request in that case, are almost identical in this case. In that case, the police officer approached the passenger of a car and said, show your hands, and the passenger, in response to that, instead reached over to the counsel with one hand and put something in his waistband in another hand. And based on that, this court found, based on that plus the officer's experience, was enough to pat him down. And let me say, in that case, and counsel argued in her brief that, well, but the case was different because he was already detained based on suspect of a vehicle theft. However, a vehicle theft is a crime that does not involve a weapon. So you still need completely different articulable facts to support patting someone down. And this court found that those furtive movements, so they stopped them, but in order to pat him down, it was the furtive movements and the officer's experience that this court found was enough. And it's almost identical to what we have in this case. Was there testimony about the officer's experience? There was. I do believe the officer said that, yes, in that case. Oh, in this case, I think I don't have a specific site for his experience. But I will say, so again, even though counsel argues that while these movements could have been innocent and that he had a right to not comply, he sure did. He did have to comply, but that doesn't mean that it's not mutually exclusive. I mean, he can still perform movements that are also suspicious. And that's why this argument was rejected in Illinois v. Ward Law, which found that an unprovoked flight upon noticing police may not be indicative of wrongdoing, but it is a type of nervous and evasive behavior that's a pertinent factor to determining reasonable suspicion. And that it doesn't mean that you can't take what he did in consideration in the totality of the circumstances analysis. So the reasonable suspicion wasn't only that this person might have had a gun in his pocket. When he turned away from the officer, the officer could logically also be afraid for his own safety and the safety of others. Like, that would be a good way to draw a gun and start shooting. Well, exactly. I mean, these officers are experienced officers that are on the street. They see this every day. They're investigating. Let's not forget what they're investigating. We don't have to ignore that anonymous tip. They're investigating that this man may be armed. And this is a fair inference, and it was the same inference with even more fair here where they were actually investigating a crime that involved a weapon than in Richardson where they were not. Well, we don't know if they were investigating a crime with a weapon, because at this point they didn't know whether he had a white card or a concealed carry license. Well, it's still a weapon. And regardless of whether it was illegal or not illegal at that point, they're still investigating a crime. And as the Illinois Supreme Court said in Kohler, a risk to a police officer posed by potentially armed individuals is not always eliminated simply because the weapon may be legal. So at this point, they're investigating a weapon. They think this guy may be armed, and it is the prudent thing to do. This is the crux of Terry, that the crux of Terry is to protect the officer who's investigating him. So these facts in this quick assessment that the officer had to do without the benefit of all the hindsight and the scientific analysis, they're on the street. They want to protect themselves and everyone around them. And based on the information they had, an anonymous tip that this person who met this exact description, this exact location, may have been armed, and they're seeing his furtive movements towards a location that's very obvious that he may wear a gun, might be kept, made this a very reasonable. And the description was pretty specific. Specific, very specific, with the dreadlocks and the color of the yellow shorts and the black shirt. Yes, very specific. But the thing is, is that they never really did get to do that pat-down, because the moment that the one officer touched the shoulder, the other officer instantly saw the gun protruding out of the packet and recovered it, the same packet where he was hiding. So, and at this point, you have probable cause, and though defendant argues that mere possession may not be illegal, and so it does not give rise to probable cause alone, but this ignores the other facts present in the case. So, the right to possess a gun in Illinois is subject to meaningful regulation. And the mere possession was not all that was known at this point. We have, in addition to the mere possession that now they have, possession of the gun, they have all the, they're aware of the nervous and evasive movements that the defendant engaged in in and around the possession of that gun in response to what they said, to hide their gun, to avoid contact with the police. So, as this court found in Thomas very recently, defendant's suspicious actions upon seeing the police gave police probable cause, at the very least, that the defendant illegally possessed the handgun. You know, counsel argues that mere possession isn't enough, and verve movements alone aren't enough. But here we have them together. Together, here they were enough. And, you know, he sure didn't act like he had legal possession of the gun. And is this court, you know, he's trying to hide that gun. Is this court found, again, in Thomas, in the existence of the possible innocent explanation did not necessarily negate probable cause. So, you know, when this court is cognizant of the officers had to make that quick appraisal, that they have to rely on the officers' experience, we're talking about probabilities here, not scientific formulas, then this court should understand that those officers' determination, that his actions in and around his possession of the gun, that the gun was probably illegal. Probably. It probably is what we're talking about, probable cause. When did they find out that it was illegal? Was there testimony that there was no FOI card? He was a felon. I'm just asking if there was testimony that he didn't have a FOI card. I don't believe there was. So the point is, probably is what we're talking about here. We're talking about probable cause. Probably. And his actions made it probable. And this court found that in Thomas, this court found that very thing in Thomas, that even though the actions could have been innocent, they don't necessarily negate probable cause. We're talking about probably here. And so, again, he did not need to ask. I mean, he could have asked. He could have asked more questions if they did not get, I mean, those provisions in the concealed carry act and the criminal code that allows an officer to ask doesn't require him to ask. It would be, those provisions are helpful to an officer who don't already have probable cause to develop probable cause or not. And they can ask questions and find out it's legal possession and move on. But these officers, it doesn't override the longstanding principles of using the totality of the circumstances analysis in determining probable cause. So they already had it at this point. So at that point, they didn't need to ask. And it doesn't, the fact that they didn't ask didn't negate that they had the probable cause. So, but the police had reasonable suspicion to pat the defendant down for their safety and probable cause to arrest the defendant based on his behavior in and around his possession of the gun. Certainly didn't act like it was a legal gun. I mean, let me also, you know, say that even a partial exposure of a gun on a street, a mostly concealed firearm, is illegal in Illinois unless you have a concealed carry license, unless you have a FOIC card, you can't be a felon. So even, they had, it certainly was probable. And probable is not more likely than not. It's less than more likely than not. It's probable. It certainly was probable, reasonable with these officers' experience that this gun was, the possession of the gun was illegal at this point. So we're asking that you affirm the trial court's denial of the motion to suppress and affirm the defendant's conviction. Thank you. Thank you. Your Honor, some of the biggest problems with the State's argument here is that it's changed its theory on appeal. When this motion was legated at trial, nobody was arguing this was a consensual encounter up until the point he was grabbed. The officers didn't testify that. Oh, we were just asking him questions, and the second he turned, we thought he was going to pull out a gun and shoot us, and that's why we grabbed him. That's not what happened. Everybody was operating under the understanding that the tip was enough, the tip of a gun was enough for the officers to go seize. So the State is saying here, you know, that these factors weren't present, but the State didn't present evidence at trial suggesting this was a consensual encounter. This wasn't their theory. The State's attorney argued at trial that the tip was reliable and was sufficient for the officers to go and have a reasonable suspicion to stop this man. To the extent that the record doesn't suggest whether their guns were out or, you know, other factors like that, you know, what tone of voice they used, it's because they didn't pursue that theory below, and they didn't meet their burden to show at that point it was a consensual encounter. So the State's saying now that this furtive movements, which the officer didn't say, it was only because of the furtive movements that we felt we had a reasonable suspicion. He grabbed him at that point because, as he explained, he repeatedly refused to comply with my orders. The officer already believed him to be seized at that time. So everything that happened below – That's not what the trial court ruled, is it? The trial court said that the tip and the movement made it a reasonable suspicion that he had a gun. Everybody was operating kind of under the old regime, the pre-Aguilar regime, that just having a gun is enough. I don't know that I agree that the record supports that argument. So to the extent that they were arguing that the tip was enough to search, it does appear that the officers, when they went there, thought that was enough to order everyone to put their hands up. They weren't asserting that this was a consensual encounter below. The State also argues that, you know, the act is a furtive movement. Again, I would suggest to you that the State is conceding that the men were being ordered, and their argument, they're classifying it as a request. So when the officer testified, he said, we got out of the car, announced our office, and asked everyone to put their hands up. He was later on cross-talking about it. He said, why did you grab him at that moment? Because he refused to comply with our orders. So he characterized it as both a request and an order. But it was clear that his understanding was that he was frisking – grabbing that point to frisk for safety because he was already lawfully in an investigation. In other words, he thought, you know, grabbing him was pursuant to the second prong of terror where he could frisk, and he already had lawfully seized him under the first prong of terror based on this reliable tip. So, you know, the State is changing its theory now and saying, no, no, you know, we concede he couldn't have stopped them then. He did stop them then, but that's not how the officer viewed it at the time. And, you know, the State cites cases that furtive movements can justify, you know, a seizure along with the tip of a gun. But the cases that the State cites are much different than his act here of merely putting his hands in the pocket and turning to leave the encounter. It's a big deal in cases of headlong flight immediately upon seeing the officers, and we just don't have that kind of suspicious movement here that would suggest that, oh, this man is not only carrying a gun, but that it's an unlicensed gun. Our courts have recognized that being stopped and questioned by the police is a nerve-wracking experience, and that's even more so when a weapon is involved. Anyone carrying a weapon, lawfully or not, knows that the presence of the weapon is going to make the police more likely to be concerned for their safety. So, you know, you're dealing with a heightened situation where, of course, people are going to be maybe nervous to have an officer receive that gun. And as the State points out, Illinois law does require the handgun to be carried. We have concealed carry law. So the act of seeing a police officer moving to make sure the gun is concealed is equally consistent, you know, a reason to be doing that rather than an admission that somehow this is an unlawful gun. So, you know, the final point I wanted to make was, you know, the State was saying that, what are police officers supposed to do when they get a call of a weapon here? Shouldn't, you know, the fact that we're investigating something inherently dangerous change the calculus? But that was already rejected by the Supreme Court in jail. And very similar to this case, they got a tip of an individual with a gun, an anonymous tip. They said, no, we're not going to carve out a special exception for dealing with weapons. We think carry already sufficiently protects officers because they have to have a particularized suspicion, and in that case, then they can go and do it for us. But here we don't have any particularized suspicion that this individual is not allowed to carry a firearm. And based solely on an anonymous tip that's not itself reliable, they can't simply go and grab him and pat him down. And that's under jail as well. Do you guys have any further questions? Nope. Commander Michelson respectfully asks that this court find that his motion to suppress should have been granted and suppress the gun as well as any of the fruits from the unlawful arrest. Thank you. Thank you for the arguments and the briefs, as usual. Very well done. We will take it under advisement. We're going to move back for a panel change right now for the next panel.